IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRUCE A. HAMMOCK, | ) | Case No. 1:17-CV-1939 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| OFFICER ROGERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     Introduction and Procedural Background

Plaintiff, Bruce A. Hammock, filed a 42 U.S.C. § 1983 complaint, alleging that

Mansfield Police Officers T. Rogers, R. Dittrich, R. Garner, J.R. Kingsborough, Don Rhinehart,

J. Soehnlen, Patrick Williams, and T. Stanz (the "Officer defendants"); Mansfield City,

Mansfield Police Chief Phil Messer, and Mansfield Police Captain Bret Snavely, (the "Mansfield

defendants"); and Richland County Sheriff, Steve Sheldon, and Sergeant Mark Collier (the

"Richland County defendants") violated his constitutional rights during his arrest and subsequent

detention.  ECF Doc. 22-1; ECF Doc. 27.[1]  Specifically, Hammock alleged that: (1) the Officer

defendants used excessive force, or failed to intervene against the excessive use of force, during

his arrest, in violation of his *Fourth Amendment* rights; (2) the Officer defendants, Captain

---

[1] Hammock's original complaint named the Officer defendants and several John/Jane Doe defendants.
ECF Doc. 1.  Hammock later amended his complaint to add the Mansfield City defendants, the Richland
County defendants, and Advanced Correctional Healthcare – the medical services contractor for the
Richland County Jail.  ECF Doc. 22-1; ECF Doc. 27.  On March 18, 2019, the Court dismissed
Hammock's claims against Advanced Correctional Healthcare and denied as futile Hammock's motion to
amend his complaint to name the John/Jane Doe defendants.  ECF Doc. 92; ECF Doc. 113.

Snavely, and the Richland County defendants were deliberately indifferent to his serious medical

needs, in violation of his due process rights under the *Fourteenth Amendment*; (3) Officer

Rhinehart, Officer Williams, Captain Snavely, and Chief Messer failed to supervise the Officer

defendants and enforce established use-of-force and medical care policies, in violation of his due

process rights under the *Fourteenth Amendment*; (4) Mansfield City and Chief Messer in his

capacity as a policy-maker were liable for the subordinate officers' unconstitutional conduct

because they failed to train the Officer defendants to differentiate head injuries from

drug/alcohol use and failed to approve an express policy requiring officers to use dash and body

cameras; (5) the Richland County defendants failed to train and supervise jail staff to recognize

head trauma and summon medical care; (6) Sheriff Sheldon had a policy or custom of denying or

delaying medical care, in violation of his *Fourteenth Amendment* rights; and (7) the Officer

defendants, Mansfield City defendants, and Richland County defendants negligently or

intentionally inflicted emotional distress upon him by denying or delaying his access to medical

care. ECF Doc. 27 at 7-12.

       The Officer defendants, Mansfield City defendants, and Richland County defendants now

renew their motion for summary judgment under Federal Rule of Civil Procedure 56. ECF Doc.

85; ECF Doc. 115. Plaintiff Bruce Hammock opposes the defendants' motions and requests that

summary judgment be granted in his favor. ECF Doc. 94; ECF Doc. 94-1.[2] Hammock also

---

[2] This action was originally referred to me for general pretrial supervision and preparation of a report and
recommendation ("R&R") on any dispositive motions. ECF Doc. 5. On August 22, 2019, I issued an
R&R recommending the Court grant the defendants' motions for summary judgment. ECF Doc. 118.
Thereafter, Hammock filed a "motion to provide plaintiff proper service of Richland County defendants'
motion for summary judgment," in which Hammock asserted that he was denied an opportunity to oppose
the County defendants' motion because he was never served a "proper copy" of it. ECF Doc. 120. The
County defendants responded that they had, in fact, served Hammock and produced a certified mail
receipt indicating that Hammock received service of their motion on April 5, 2019. ECF Doc. 121; ECF
Doc. 121-2. On September 19, 2019, the Court denied as moot each of the motions subject to my R&R,
declared each motion re-filed, ordered the parties to serve their motions again, and ordered Hammock to

requests that this court take judicial notice that the exhibits attached to his response in opposition to the Officer and Mansfield City defendants' motion were produced by the defendants and that he does not have any other evidence or means of obtaining evidence.  ECF Doc. 100.  Finally, Hammock seeks leave to amend his complaint, which the defendants oppose.  ECF Doc. 133; ECF Doc. 134; ECF Doc. 138.

The defendants' motions for summary judgment, Hammock's request for judicial notice, and Hammock's motion to amend were referred to me for preparation of a report and recommendation.  ECF Doc. 131; ECF Doc. 137.  Because I agree that Hammock has failed to sufficiently plead his excessive force claims against the individual Officer defendants, has failed to produce evidence sufficient to create a genuine issue of material fact supporting his other claims, and that the defendants are entitled to judgment as a matter of law on all of Hammock's claims, I recommend that the Court: (1) grant the Officer defendants', Mansfield defendants', and Richland County defendants' motions for summary judgment (ECF Doc. 85; ECF Doc. 115); and (2) grant *sua sponte* summary judgment on Hammock's emotional-distress claims in favor of the Officer defendants and Mansfield defendants.  Further, because Hammock has no

---

show cause why he falsely represented that he was not served a copy of the County defendants' motion. ECF Doc. 123; ECF Doc. 124.

On September 27, 2019, Hammock filed a brief stating that the County defendants had served their motion for summary judgment on a compact disc, which he was unable to access.  ECF Doc. 127.  The County defendants responded that *Hammock asked them to serve him documents on a compact disc*.  ECF Doc. 128; *see also* ECF Doc. 128-1 (Hammock requesting "all documents . . . produced throughout discovery" be served on a compact disc); ECF Doc. 128-2 (same).  The court ordered the County defendants to serve Hammock a paper copy of their motion for summary judgment, and that Hammock would have 30 days from service to file a response brief.  ECF Doc. 130.  On October 8, 2019, the County defendants filed a "notice of service," indicating that they served Hammock with a paper copy of their motion on September 24, 2019.  ECF Doc. 132.  On October 25, 2019, the court warned Hammock that his response brief was due on November 7, 2019.  ECF Doc. 135.  Nevertheless, Hammock has not filed a response brief.  Still, the Court should review the County defendant's motion for summary judgment as though it were opposed under a liberal construction theory, because it is clear from the record that Hammock opposes it.

remaining claims in this case, I recommend that Hammock's motion for judicial notice (ECF Doc. 100) be denied as moot.  Finally, I recommend that the court deny Hammock's motion for leave to amend his complaint (ECF Doc. 133).

## II.     Facts

### A.     Traffic Stop and Arrest

The following facts are undisputed and/or established by the Rule 56 evidence.  On September 22, 2015, Officer Rogers and Officer Dittrich were assisting with traffic control when Officer Rogers saw Hammock violate a road closure and initiated a traffic stop.[3]  ECF Doc. 85-1 at 1; ECF Doc. 85-2 at 1.  Officer Rogers and Officer Dittrich approached Hammock's vehicle on foot.  ECF Doc. 85-2 at 1.  Officer Dittrich observed Hammock "making furtive movements with his right hand towards the center console," suspected that Hammock had a gun, and tapped on the passenger side window to distract him.  *Id.*  Hammock then fled the scene at "a high rate of speed."  ECF Doc. 85-2 at 1; ECF Doc. 94-8 at 28.

Officer Rogers and Officer Dittrich engaged in a short pursuit that ended when Hammock crashed into a tree, impacting on the front driver's side.  ECF Doc. 85-2 at 2; ECF Doc. 94-5 at 1; ECF Doc. 94-7 at 5; ECF Doc. 94-8 at 23; ECF Doc. 94-11 at 1.  During the pursuit, Officer Rogers and Officer Dittrich contacted other officers over the radio, including Sergeant Rhinehart and Officer Kingsborough.  ECF Doc. 85-3 at 1; ECF Doc. 85-4 at 1.  Officer Kingsborough heard the situation developing over the radio and saw the flashing police cruiser lights.  ECF Doc. 85-3 at 1.  Officer Stanz, Officer Williams, and Officer Soehnlen were also on duty and responded to the scene.  ECF Doc. 85-7; ECF Doc. 85-8; ECF Doc. 85-9.  After the incident, Sergeant Rhinehart assisted the pursuit over the radio, did not personally respond to the scene,

---

[3] Hammock does not dispute whether the officers had probable cause to conduct the traffic stop.  ECF Doc. 94-1 at 2.

and later completed a "pursuit critique and analysis," which indicated that the pursuit averaged 45mph to 55 mph, lasted only one minute, and covered half a mile.  ECF Doc. 85-4 at 1-2; ECF Doc. 94-8 at 1-3; ECF Doc. 94-10 at 3.  Officer Kingsborough completed a "traffic crash report," which estimated that Hammock was driving at 25mph when he crashed.  ECF Doc. 94-7 at 3.

Officer Kingsborough arrived at the scene after Hammock had crashed into the tree and parked his cruiser behind Hammock's vehicle.  ECF Doc. 85-3 at 2.  Officer Dittrich informed the other officers that he suspected Hammock had a gun.  ECF Doc. 85-1 at 2; ECF Doc. 94-8 at 20, 33-34.  Officer Rogers approached the vehicle from the driver's side with his weapon drawn, and Officer Dittrich approached from the passenger side.  Id. at 2.  In his declaration, Hammock stated that he put his hands out the window of his car "immediately" after crashing.  ECF Doc. 94-2 at 1.  Officer Rogers, in his affidavit, stated that he instructed Hammock "to show his hands several times before he complied."  ECF Doc. 85-1 at 2.  Officer Rogers, Officer Dittrich, and Officer Kingsborough all stated in their affidavits that Hammock again attempted to flee and backed into Officer Kingsborough's cruiser.  ECF Doc. 85-3 at 2; ECF Doc. 94-5 at 3-8 (photos showing the cruiser behind the vehicle and damage to the front of the cruiser); ECF Doc. 94-9 (accident report for the collision between Hammock's vehicle and Officer Kingsborough's cruiser).  As Hammock was attempting to reverse his car, Officer Rogers pulled Hammock through the window of the vehicle.  ECF Doc. 85-1 at 2; ECF Doc. 94-8 at 8.  Officer Dittrich was still on the other side of the car when Hammock was removed from it.  ECF Doc. 94-8 at 16.

According to Hammock's declaration[4], the officers could have allowed him to exit the car through the door because the vehicle "was not in such close proximity to a tree as to prevent

---

[4] Hammock's declaration substantially complies with 28 U.S.C. § 1746's requirements that the declarant: (1) declare under the penalty of perjury that the statements are true and correct, (2) state the date it was executed; and (3) sign it.  Further, the defendants have not shown that Hammock's declaration should be

it from being opened." ECF Doc. 94-2 at 1.  Hammock said that, after being removed from the car through the window, he was "slammed to the ground," and he was restrained.  Id.  Once he was handcuffed, Officer Kingsborough, Officer Rogers, and Officer Garner "beat [him] until [he] lost consciousness." Id. at 1-2.  Hammock said he was then "thrown" into the back of a cruiser and Officer Williams "struck [him] in the face for not having [his] feet on the floor." Id. at 2.  Hammock further stated that he requested medical attention due to "open wounds to the head" and "a significant amount of swelling of the head," but he "was never provided medical aid, or even offered medical aid." Id. at 2-3.  Hammock said that he never refused medical aid, complained about the excessive force during his arrest, and wanted to file a report; however, he was told that he "couldn't do anything about it [un]til [he] got out of jail." Id. at 2.

According to the officers' affidavits and deposition responses, Officer Rogers "assisted [Hammock] through the driver's side window" because the driver's side door was too close to the tree he hit to be opened. ECF Doc. 85-1 at 2; ECF Doc. 85-2 at 2; ECF Doc. 85-3 at 2.  The officers then placed Hammock in handcuffs "without incident." ECF Doc. 94-8 at 12.  An inventory of the vehicle revealed that Hammock had a loaded handgun with the safety disengaged and crack cocaine. ECF Doc. 85-1 at 3; ECF Doc. 85-2 at 2; ECF Doc. 94-10 at 2-3.  The officers determined that Hammock was intoxicated based on his "glassy, bloodshot eyes, slurred speech, a strong odor of alcohol[,] and an unsteadiness on his feet." ECF Doc. 85-1 at 3; ECF Doc. 85-2 at 2; ECF Doc. 94-7 at 2; ECF Doc. 94-8 at 12, 17, 29.  Sergeant Rhinehart and Officer Stanz said that they did not personally interact with Hammock, and all of the officers said that they did not beat Hammock or see any other officer beat Hammock. ECF Doc. 85-1 at 3; ECF Doc. 85-2 at 2; ECF Doc. 85-3 at 2; ECF Doc. 85-4 at 2; ECF Doc. 85-6 at 1; ECF Doc.

---

disregarded as a sham declaration, because they have not indicated that it is inconsistent with previous deposition testimony. *See Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).

6

85-7 at 1; ECF Doc. 85-8 at 1; ECF Doc. 94-8.  The officers also all stated that they did not

observe any injury on Hammock, except that he had "a few cuts on his nose."  ECF Doc. 85-1 at

3; ECF Doc. 85-2 at 2; ECF Doc. 85-3 at 2; ECF Doc. 85-4 at 2; ECF Doc. 85-6 at 1; ECF Doc.

85-7 at 1; ECF Doc. 85-8 at 1; ECF Doc. 94-8 at 10, 26-27, 30, 39.  Officer Williams and

Sergeant Rhinehart indicated that Hammock refused medical treatment when it was offered to

him, and the other officers said that they were not aware Hammock required medical attention.

ECF Doc. 85-1 at 3; ECF Doc. 85-2 at 2; ECF Doc. 85-3 at 2; ECF Doc. 85-4 at 1-2; ECF Doc.

85-6 at 1; ECF Doc. 85-7 at 1; ECF Doc. 85-8 at 1; ECF Doc. 94-8 at 2-3, 10, 18.  Officer Stanz

indicated that he could have summoned medical assistance, but he did not because Hammock

never requested it.  ECF Doc. 94-8 at 27.  Officer Kingsborough stated that Hammock later

needed "to be awakened to be advised of the charges against him," which he believed was due to

Hammock's intoxication and not a concussion or injury.  ECF Doc. 85-3 at 2; ECF Doc. 94-8 at

11, 13-14.  Officer Soehnlen said that he never personally saw or talked to Hammock.  ECF Doc.

94-8 at 40-41.

     **B.**    **Hammock's Jail and Medical Records**

Officer Williams took Hammock to Richland County Jail, and he was booked into the jail

at 8:55 am on September 23, 2015.  ECF Doc. 115-4; ECF Doc. 94-2 at 3.  On the jail intake

form, Officer Williams indicated that Hammock had not "sustained a known injury or

complained of any injury during the arrest," and the corrections officer indicated that Hammock

did not "appear . . . in need of any immediate medical or mental health attention."  ECF Doc.

115-4 at 9.  Hammock signed a booking questionnaire, which indicated that he broke his tooth

during the arrest and that he complained that his ribs and left arm hurt; however, the

questionnaire also indicated that Hammock did not appear confused or disoriented or have any

physical injuries or deformities.  ECF Doc. 94-6 at 76-78; ECF Doc. 115-4 at 4-6.  Although the

questionnaire asked Hammock about his health conditions, medications, and any additional

information not specifically addressed in the questionnaire, Hammock did not indicate that he

had sleep apnea or needed a CPAP machine.  ECF Doc. 94-6 at 76-78; ECF Doc. 115-4 at 4-6.

No acute head injury was visible in Hammock's booking photos, except that he had a swollen

lip.  See ECF Doc. 94-6 at 1-2; ECF Doc. 115-5.

At 10:00 am on September 23, 2015, the jail nurse evaluated Hammock.  ECF Doc. 94-6

at 13.  Medical records indicate that Hammock had an "unusually swollen" upper lip, a loose

(but not broken) tooth, mild bruising on his right thigh and left knee, and tender ribs.  ECF Doc.

94-6 at 13; ECF Doc. 115-7 at 58.  The jail nurse gave Hammock ibuprofen, but his ibuprofen

was discontinued when he said he vomited blood.  ECF Doc. 94-6 at 13, 54; ECF Doc. 115-7 at

58.  On September 24, 2015, Hammock told medical staff that he had "not been throwing up

blood and want[ed] to go upstairs."  ECF Doc. 94-6 at 13; ECF Doc. 115-7 at 58.  He also stated

that he had a prescription for Wellbutrin and Vistaril, and jail medical staff gave him those

medications.  ECF Doc. 94-6 at 13; ECF Doc. 115-7 at 58.  Medical records do not indicate that

Hammock made any other requests on September 23-24, 2015.  ECF Doc. 94-6 at 13; ECF Doc.

115-7 at 58.

On October 3, 2015, Hammock requested medical services because he had an infected

"bump" in his mouth.  ECF Doc. 94-6 at 20; ECF Doc. 115-7 at 3.  Nurse J. Ryan reviewed

Hammock's request and gave him antibiotics and pain medications on November 1, 2015.  ECF

Doc. 94-6 at 20-21; ECF Doc. 115-7 at 38-39.

On October 12, 2015, Hammock told the jail nurse that he had rib pain due to his motor

vehicle accident and Mansfield Police beating him up.  ECF Doc. 94-6 at 14; ECF Doc. 115-7 at

45.  On examination, the nurse noted that Hammock's ribs, shoulder, and elbow were tender.
ECF Doc. 94-6 at 14; ECF Doc. 115-7 at 45.  The nurse prescribed Hammock ibuprofen for the
pain and referred him for an x-ray.  ECF Doc. 94-6 at 14; ECF Doc. 115-7 at 45.  The x-ray
showed that Hammock's ribs were normal and that there were no fractures or dislocations in his
back.  ECF Doc. 94-6 at 15; ECF Doc. 115-7 at 44.

On October 25, 2015, Hammock requested treatment for "knee problems" and pain,
numbness, and limited movement in his arm and shoulder.  ECF Doc. 94-6 at 18; ECF Doc. 115-
7 at 33.  On November 12, 2015, Hammock filed another request for treatment of arm numbness
and said that he continued to have a "bump" in his mouth.  ECF Doc. 94-6 at 50; ECF Doc. 115-
7 at 37.  On November 14, 2015, the jail nurse noted that Hammock had pain in his left arm and
both wrists, limited range of motion in his left arm, and a "possible pyogenic granuloma" in his
mouth.  ECF Doc. 94-6 at 51; ECF Doc. 115-7 at 34.  The nurse referred Hammock to a dentist.
ECF Doc. 94-6 at 51; ECF Doc. 115-7 at 34.  On November 27, 2015, the jail nurse evaluated
Hammock's shoulder and knee pain.  ECF Doc. 94-6 at 19; ECF Doc. 115-7 at 32.  The nurse
noted that Hammock said he could not raise his arm above his head and that he could buy
ibuprofen/Tylenol from the commissary.  ECF Doc. 94-6 at 19; ECF Doc. 115-7 at 32.

On November 10, 2015, the Richland County Jail requested medical records from OSU
Wexner Medical Center.  ECF Doc. 94-6 at 23; ECF Doc. 115-7 at 60.  The records contained a
review of Hammock's medical history and symptoms, which indicated that he had several knee
and hand surgeries and that he was non-complaint with a CPAP prescription.  ECF Doc. 94-6 at
25, 32.  The records also showed that, on April 29, 2015, David Flanigan, MD, determined that
Hammock had a sprained ligament, bone cyst, and internal derangement in his knee, requiring
surgery.  Id. at 26.  Hammock had knee surgery on May 14, 2015.  Id. at 27-38.  After the

9

operation, he received an ACL brace and was scheduled for a follow-up to investigate any remaining issues with his knee. *Id.* at 31. Medical records indicate that Hammock had "no major issues" on June 29, 2015; and on August 12, 2015, he had a normal gait despite his inability to get an ACL brace due to insurance issues. *Id.* at 44-47. On September 18, 2015, Kyle Muller, PA-C, noted that Hammock had a normal gait, and scheduled a follow-up x-ray and CT scan to determine whether he should proceed with the second stage of his ACL revision. *Id.* at 48-49.

On December 9, 2015, Hammock filed a grievance, stating that he had reported injuries sustained during his arrest when he was booked, filed several medical services requests seeking treatment for those injuries, and that his symptoms persisted or got worse. ECF Doc. 94-6 at 53; ECF Doc. 115-6 at 1; ECF Doc. 115-7 at 17. The jail nurse reviewed Hammock's records and summarized his complaints and treatment as follows:

Booked in on 9-23-15 – complaints of Broken tooth, Rib pain, and Lt arm pain.

Nurse evaluated on 9-23-15 – Bruising on jaw, Loose tooth, no broken tooth, Pain in Rt side ribs, Bruises on Rt thigh and Left knee. Complaints of pain in left elbow. Doctor notified and ibuprofen started, then complained of vomiting blood. No bloody vomit was seen. Doctor notified and stopped ibuprofen.

Nurse evaluated on 9-24-15 – Denied nausea or vomiting. Reviewed meds, obtained orders, and started medications.

On 9-30-15 you were caught cheeking/holding your medication. Doctor notified and orders changed.

On 10/12/15 seen at Doctors Sick call and complained of being "Beat up by Police." Continued to complain of Right Rib pain. Doctor ordered Rt side Rib x-ray and ibuprofen.

On 10/13/15 Right Rib x-ray completed with Results being Negative for fracture.

On 10/31/15 Seen at Nurse sick call with complaints of a bump in mouth. Doctor notified, orders started for antibiotic and ibuprofen.

> On 11/9/15 approached med car complaining that No treatment or follow up with OSU for a "surgery"
>
> On 11/10/15 OSU contacted for patient records.  Records Received showing a follow-up appointment on 9-18-15 – 4 months after procedure to Left knee. PLM, Bone grafting of femur/tibia, hemipatellectomy.  Recommendation for ACL Brace and F/U for x-ray/CT to eval Bone grafting/healing before proceeding Stage 2 of ACL Revision.  The doctor reviewed these and made no new orders due to not being a life sustaining procedure.
>
> On 11-12-15 seen at Nurse sick call for bump in mouth again and was Referred to outside Dental.
>
> On 11-27-15 seen in nurse sick call for complaint of arm and shoulder pain and started on ibuprofen.
>
> You have Not complained of knee pain during your stay.  Thus no treatment has been given for any knee concerns.

ECF Doc. 94-6 at 54; ECF Doc. 115-6 at 2; ECF Doc. 115-7 at 17-18.  Hammock stated that the nurse's response did not resolve his grievance because "there ha[d] been nothing done other than the x-ray of [his] ribs."  ECF Doc. 115-6 at 1.  The jail administration responded that Hammock had received adequate medical care.  *Id.*

On December 14, 2015, Hammock saw a dentist, who found that he had a periapical infection and parulis with a slight amount of pus draining from his gums.  ECF Doc. 94-6 at 59; ECF Doc. 115-7 at 27.  The dentist prescribed amoxicillin for the infection.  ECF Doc. 94-6 at 59; ECF Doc. 115-7 at 27.

On December 15, 2015, Hammock filed a treatment request, stating that his shoulder, elbow, and wrist were painful and swollen since he arrived at the jail on September 23, 2015, but that "nothing ha[d] been done."  ECF Doc. 94-6 at 55; ECF Doc. 115-7 at 26.  On December 16, 2015, Hammock told the jail nurse that his arm, shoulder, and wrist were numb/painful; his knee was numb; and he had a bump in his mouth.  ECF Doc. 94-6 at 56; ECF Doc. 115-7 at 25.  The prison nurse indicated that Hammock had an active range of motion on examination, that his

symptoms would be monitored, and that he understood the plan of care.  ECF Doc. 94-6 at 56;
ECF Doc. 115-7 at 25.

On December 17, 2015, Hammock filed a medical request, stating that his throat was

sore.  ECF Doc. 94-6 at 57; ECF Doc. 115-7 at 24.  On examination, the jail nurse noted that

Hammock had an active range of motion and that his lymph nodes were swollen and tender.

ECF Doc. 94-6 at 58; ECF Doc. 115-7 at 23.  The nurse prescribed Hammock Tylenol.  ECF

Doc. 94-6 at 58; ECF Doc. 115-7 at 23.

On December 20, 2015, Hammock requested nurse treatment and new sandals because

his sandals and weight gain caused pain and swelling in his knees.  ECF Doc. 94-6 at 60; ECF

Doc. 115-7 at 21.  On December 31, 2015, the jail nurse noted that Hammock had active range of

motion in all his extremities, callouses on his feet, and a history of knee surgery.  ECF Doc. 94-6

at 61; ECF Doc. 115-7 at 20.  Hammock also complained that he had wrist pain and acid reflux.

ECF Doc. 94-6 at 61; ECF Doc. 115-7 at 20.  The nurse prescribed Hammock acid reflux

medication and stated that he could buy ibuprofen/Tylenol for his pain at the commissary.  ECF

Doc. 94-6 at 61; ECF Doc. 115-7 at 20.

On January 10, 2016, Hammock requested treatment because his wrist was "swollen and

painful."  ECF Doc. 94-6 at 62; ECF Doc. 115-7 at 14.  On examination, the jail nurse noted that

Hammock's range of motion in his wrist was within normal limits, but his left wrist appeared

bigger than his right wrist.  ECF Doc. 94-6 at 63; ECF Doc. 115-7 at 13.  The nurse diagnosed

Hammock with "possible pain," and said that he could purchase ibuprofen/Tylenol at the

commissary.  ECF Doc. 94-6 at 63; ECF Doc. 115-7 at 13.  Hammock requested a follow-up for

his wrist on January 26 and 27, 2016.  ECF Doc. 94-6 at 63, 66-67; ECF Doc. 115-7 at 6-7.  On

January 28, 2016, Hammock told the jail nurse that he had pain in his left wrist due to trauma in

August.  ECF Doc. 94-6 at 68; ECF Doc. 115-7 at 3.  The nurse noted that Hammock had active range of motion in all four extremities, but he had grinding and limited range of motion in his left wrist.  ECF Doc. 94-6 at 68; ECF Doc. 115-7 at 3.  The nurse ordered an x-ray, which showed no evidence of fracture, dislocation, other significant bony abnormalities, or soft tissue abnormalities.  ECF Doc. 94-6 at 71; ECF Doc. 115-7 at 2.

Medical records from February 2, 2016, indicate that Hammock was scheduled for a knee surgery and needed a CT scan and x-ray before his surgery could be performed.  ECF Doc. 94-6 at 72; ECF Doc. 115-7 at 1.  Hammock had knee surgery on March 10, 2016.  ECF Doc. 94-6 at 75, 81.

On February 8, 2016, the Richland County Sheriff's Office released Hammock from jail into Ashland County's custody.  ECF Doc. 115-8 at 1, 3; ECF Doc. 115-9 at 3.  On the same day, Hammock had an exam, which indicated that he did not have any musculoskeletal problems and that his only respiratory issue was "well controlled" asthma.  ECF Doc. 94-6 at 73.

On April 12, 2016, Hammock was returned to Richland County custody.  *See* ECF Doc. 94-6 at 83-84 (intake records indicating Hammock's dietary requirements and requesting medical records for inmate treatment/medications); ECF Doc. 115-9 at 3.  On a medical history questionnaire, the jail intake nurse noted that Hammock used a CPAP for sleep apnea and needed a knee brace.  ECF Doc. 94-6 at 82.  Medical records from April 12, 2016, also indicate that Hammock's knee had "healed well" and did not have any swelling.  *Id.* at 81.

C.    **Richland County Affidavits**

On March 28, 2019, Richland County jail administrator, Captain Chris Blunk, stated in an affidavit that jail policy allowed an inmate with sleep apnea to use a CPAP if he had his CPAP with him at booking or had it dropped off at the jail while he was incarcerated.  ECF Doc.

13

115-3 at 1.  Captain Blunk also stated that all jail employees were trained on jail policies and procedures, including inmate medical care.  *Id.*

On March 28, 2019, Sheriff Sheldon completed an affidavit, stating that he did not directly supervise or provide care to inmates incarcerated at the Richland County Jail.  ECF Doc. 115-1 at 1.  He also said that he had no personal involvement in Hammock's booking, medical care, or interactions with jail staff.  *Id.*

On March 29, 2019, Sergeant Collier stated that he was employed at the Richland County Jail and did not recall any of his interactions with Hammock while he was incarcerated from September 23, 2015, through February 8, 2016.  ECF Doc. 115-2 at 1.  He also stated that he followed all jail policies and procedures in interacting with inmates and responding to medical requests.  *Id.*

### D.    Hammock's Deposition

In a March 1, 2019, deposition, Hammock testified that the Richland County Jail staff knew he was in the middle of a two-part knee surgery when he was incarcerated.  ECF Doc. 115-9 at 2.  He stated that the jail staff received orders from his doctor and contact from his attorney explaining that he needed to have the second part of his surgery.  *Id.*  Hammock noted that he had the second part of his ACL surgery while he was released in February 2016.  *Id.* at 2-3.

Hammock also testified that he was diagnosed with sleep apnea in 2009, and that he used a CPAP machine to sleep at night.  ECF Doc. 115-9 at 4.  He said he was not perfectly compliant with using his CPAP, because he sometimes fell asleep while watching television.  *Id.* at 5.  When he did not wear his CPAP, he would snore, make loud noises, choke, and stop breathing in his sleep; however, he never required emergency services.  *Id.* at 5-6.  Hammock stated that not

using his machine caused him to have high blood pressure, high cholesterol, and breathing problems.  *Id.* at 6.

E.     **Other Relevant Mansfield Police Department Records**

In support of his claims, Hammock has produced Mansfield Police Department records, including: (1) Mansfield Police Department Regulations; (2) disciplinary records for Officer Williams and Officer Angie Eichinger; and (3) "Response to Resistance & Aggression Analysis" reports from 2013, 2014, and 2015.  ECF Doc. 94-12; ECF Doc. 94-13; ECF Doc. 94-14; ECF Doc. 94-15.

The Mansfield Police Department has several regulations governing when Officers should summon medical care.  Regulation 61.2.2(A) (Type of Response to Crashes) provides that "upon determination by first responding officers that the crash involves . . . any injuries **medical assistance** will be summoned."  ECF Doc. 94-12 at 8 (emphasis in original).  Regulation 1.3.5 (Medical Aid) provides that:

> Any time a lethal or less lethal weapon or other response to resistance/aggression as defined by this Division is used against an assailant, the person against which the weapon or response to resistance/aggression was used will be offered medical aid, monitored, or checked for injuries by an EMS first responder or medic and/or transported to a medical facility to be checked or treated.

*Id.* at 1.  The Mansfield Police Department's regulations governing use-of-force direct that officers "shall not use more force in any situation than is reasonably necessary under the circumstances."  *See* ECF Doc. 94-14 at 6.  Further, the Mansfield Police Department's regulations provide that officers "shall not mistreat persons who are in their custody, . . . handle such persons in accordance with law and divisional procedures, . . . [and] maintain proper care and control of persons in their custody at all times."  *Id.* at 4.

Officer Williams' disciplinary records indicate that in September 2013, he was suspended for two days for failing to properly control a dangerous felon and failing to document a response to resistance in accordance with division rules and regulations.  ECF Doc. 94-13 at 2.  In that case, Captain Snavely – then a Lieutenant – investigated Leviticus Drye's complaint "alleging unsatisfactory performance by Officer Williams" during his arrest.  Id. at 1, 5-21.  During Captain Snavely's investigation, Cheryl Shell reported that she saw Officer Williams chase Drye, who was handcuffed.  Id. at 5-6.  Shell said that when Officer Williams caught Drye, he slammed him against a brick wall seven times, stomped on his legs ten times, and kicked him four-to-five times.  Id.  Officer Williams denied striking or kicking Drye but admitted that he punched Drye in the back to stop him from fleeing and struck Drye's knees to force him to cooperate.  Id. at 11-12.  Captain Snavely also noted that Drye had bruises that were consistent with his complaint.  Id. at 21.  The only other item in Officer Williams' disciplinary record was a December 2012 reprimand for causing minor damage to a patrol car in the police parking lot.  Id. at 29.

Officer Eichinger's disciplinary record indicated that she was suspended for 2 days in February 2015 for violating department rules and regulations governing the use of force, treatment of prisoners, and division reports.  ECF Doc. 94-14 at 2-3.  In that case, Elleena Campbell complained that Officer Eichinger punched a handcuffed juvenile in the face and kicked her.  Id. at 7.  Captain Snavely investigated the complaint and took statements from Campbell, Officer Eichinger, and the other officers involved.  Id. at 8-14.  One of the officers stated that he saw Officer Eichinger "swat" at the arrestee's face three times, and the arrestee said she was struck in the face twice.  Id. at 13.  Captain Snavely determined that, while the other officers involved had acted within division standards for dealing with a disorderly and combative

16

arrestee, Officer Eichinger's decision to "push [the arrestee's] face into the car" was a "questionable method."  *Id.* at 13.  Captain Snavely recommended that Officer Eichinger be reprimanded and suspended as a field training officer for six months.  *Id.* at 14.  He also indicated that he was "torn between recommending a short-term suspension."  *Id.*

In the 2013, 2014, and 2015 "Response to Resistance & Aggression Analysis," Captain Snavely: (1) reviewed annual statistics on officers' responses to resistance and aggression; (2) summarized complaints filed regarding officers' use of force; and (3) recommended updates to the police departments' training.  ECF Doc. 94-15.  In 2013, officers were required to respond to resistance in 91 out of 4,885 arrests.  *Id.* at 3.  In those cases, officers used tasers 20 times, chemical sprays 24 times, and physical force 76 times.  *Id.* at 5.  The department received two complaints alleging excessive use of force in 2013, both of which were not sustained after investigation.  *Id.* at 9.  Captain Snavely recommended increased physical self-defense training for officers, because it was the highest category of use of force with the least amount of training.  *Id.* at 10.

In 2014, officers were required to respond to resistance in 105 out of 4,611 arrests.  ECF Doc. 94-15 at 14.  In those cases, officers used tasers 30 times, chemical sprays 27 times, and physical force 73 times.  *Id.* at 16.  The department received five complaints alleging excessive use of force in 2014.  *Id.* at 20.  One of the complaints – the complaint regarding Officer Eichinger – was sustained after investigation and sent to the police chief for disciplinary action.  *Id.*  Again, Captain Snavely recommended increased physical self-defense training for officers, and he noted that the department implemented his recommendation and scheduled for January 2015.  *Id.* at 21.

In 2015, officers were required to respond to resistance in 89 out of 4,773 arrests.  ECF Doc. 94-15 at 25.  In those cases, officers used tasers 34 times, chemical sprays 20 times, and physical force 122 times.  *Id.* at 28.  The department received five complaints alleging excessive use of force in 2015, none of which were sustained after investigation.  *Id.* at 32-33.  Again, Captain Snavely recommended increased physical self-defense training for officers.  *Id.*at 34.  Captain Snavely noted that the department implemented his recommendation, conducted physical self-defense training in January 2015, and conducted response to resistance and aggression training in November 2015.  *Id.* at 33-34.  In each of his reports, Captain Snavely indicated that the department's goal was to "find the optimal balance when responding to resistance and aggression," and that "officers must not use force when other options are available and must not use more force than necessary to handle the situation."  *Id.* at 11, 22, 35.

## III.     Applicable Legal Standards

### A.      Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018).  The moving party must demonstrate the "basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted).  The nonmoving party may not simply rely on his pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted).  A reviewing court must determine whether the evidence that the nonmoving party relies upon "presents

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.  In evaluating the evidence presented on a summary judgment motion, courts must draw all reasonable inferences in favor of the nonmoving party.  *Id.* at 255.  Nonetheless, a court need not accept unsupported or conclusory statements as true.  *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").

### B.    Liberal Construction for Pro Se Filings

Filings by *pro se* litigants are liberally construed and held to less stringent standards than formal documents drafted by lawyers.  *El Bey v. Roop*, 500 F.3d 407, 413 (6th Cir. 2008). Nevertheless, liberal construction for *pro se* litigants does not "abrogate basic pleading essentials."  *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).  Further, the court may not: (1) rewrite a complaint to include claims that were never presented, *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999); (2) construct the plaintiff's legal arguments for him, *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993); (3) "conjure up [unpleaded] allegations," *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979); or (4) create a claim for the plaintiff, *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975).  *See also Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (noting that holding otherwise would "transform the district court . . . to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party").

## IV.    Excessive-Force Claims

In his complaint, Hammock alleges that the Officer defendants "exhibited an unreasonable use of force in extricating [him] out of the vehicle [and] in beating [him] while in

19

handcuffs." ECF Doc. 27 at 7-8.  He also asserts that officers who did not beat him "were present and did nothing to stop the unreasonable and excessive use of force." *Id.* at 8.  Further, Hammock alleges that Police Chief Messer, Captain Snavely, Officer Rhinehart, and Officer Williams failed to supervise the officers, failed to enforce established use-of-force policy, acquiesced in the subordinate officers' unconstitutional behavior, and falsified documents in an attempt to cover up the violation of his constitutional rights. ECF Doc. 27 at 8.

### A.     Pleading Sufficiency

The Officer defendants and Mansfield defendants argue that they are entitled to summary judgment on Hammock's excessive-force claims because the "unspecific, vague allegations" in Hammock's complaint are insufficient to state excessive-force claims against the individually named officers. ECF Doc. 85 at 9, 11-13.  Hammock responds that his complaint contained sufficient factual allegations to state a claim against the individually named officers. ECF Doc. 94-1 at 17-18.

"When claiming damages for violations of constitutional rights, Plaintiffs 'must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.'" *Ondo v. City of Cleveland*, 795 F.3d 597, 610 (6th Cir. 2015) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)); *see also Sampson v. Garrett*, 917 F.3d 880, 882 (6th Cir. 2019) (applying the same standard to *pro se* prisoner litigants).  The court must determine whether the plaintiff stated a plausible constitutional violation by each individual defendant, and we are not permitted to ascribe the acts of all individual defendants to each individual defendant. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011); *see also Terrance v. Northville Reg'l Psych. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002) (stating that the plaintiff cannot rely upon "conclusory, vague, or general allegations").  Nevertheless,

courts are reluctant to apply this standard when the plaintiff can show that the officers caused his inability to specifically allege which officers committed which constitutional violations. *See Greer v. City of Highland Park*, 884 F.3d 310, 316 (6th Cir. 2018) (declining to apply the particularity requirement when the officers wore face masks and refused to identify themselves).

The Officer defendants are entitled to summary judgment because Hammock's complaint does not specifically allege which officers used excessive force and which officers failed to intervene. The general allegations in Hammock's amended complaint are insufficient to state an excessive-force claim against the defendants, because Hammock's amended complaint does not specifically state which individual officers committed which constitutional violations. *Ondo*, 795 F.3d at 610; *Sampson*, 917 F.3d at 882; *Lanman*, 529 F.3d at 684; *Heyne*, 655 F.3d at 564; *Terrance*, 286 F.3d at 842; ECF Doc. 27 at 7-12. Hammock has attempted to cure the deficiencies in his amended complaint by specifically alleging – for the first time in his response in opposition to the defendants' motion for summary judgment – that: (1) Officers Kingsborough, Garner, and Rogers pulled him through the window of his car, handcuffed him, and beat him; and (2) Officer Williams struck him in the face. ECF Doc. 94-1 at 10-16. But Hammock's attempt to cure his pleading deficiencies fails. Here, the specific allegations in Hammock's response brief are improper new factual allegations and not merely supplemental material supporting the allegations in his amended complaint. *See Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 521 (6th Cir. 2008) ("Ordinarily, when the omission of a critical allegation in a complaint is highlighted by a defendant's motion to dismiss, the appropriate method for adding new factual allegations is to request leave to amend the complaint in conjunction to responding to the motion to dismiss."); *see also Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787-88 (6th Cir. 2005) (rejecting a

plaintiff's argument that she was entitled to liberal construction of her complaint to include a new theory raised for the first time in her response to a summary judgment motion because "[o]nce a case has progressed to the summary judgment stage . . . the liberal pleading standards under . . . [the Federal Rules] are inapplicable"); *but see JAT, Inc. v. Nat'l City Bank of Midwest*, 460 F. Supp. 2d 812, 818 (E.D. Mich. 2006) ("Whe[n] Plaintiffs are not attempting to plead new causes of action against Defendants, but are merely providing additional support to their initial pleading, [courts may] allow an implicit motion to amend at [the summary judgment] stage."). Instead, the proper method for curing Hammock's pleading deficiencies is a motion for leave to amend, which Hammock has not sought. Further, Hammock's ability to specifically identify in his opposition brief which specific officers committed which alleged constitutional violations would undercut any argument that the officers attempted to obscure their identities. *Greer*, 884 F.3d at 316; ECF Doc. 94-1 at 10-16. Thus, the Officer defendants are entitled to summary judgment on Hammock's excessive-force and failure-to-intervene claims.

I recommend that the Court grant the defendants summary judgment on Hammock's excessive-force and failure-to-intervene claims.

### B.     Qualified Immunity

If the Court were to determine that Hammock's pleadings are sufficient to state excessive-force claims against the individual officers, the Court would then be required to consider whether the officers are entitled to summary judgment on the basis of qualified immunity.

The Officer defendants and Mansfield defendants argue that the court should grant them summary judgment on Hammock's excessive-force claims because they are entitled to qualified immunity. ECF Doc. 85 at 7-11.  The Officer defendants, Captain Snavely, and Chief Messer contend that Hammock cannot show that they violated Hammock's constitutional rights by using excessive force because: (1) he has not produced any evidence that the officers' used any force beyond pulling him through the window of his car; and (2) the officers' use of force was reasonable under the totality of the circumstances. *Id.* at 8-11.  They also assert that Officers Rhinehart, Soehnlen, Captain Snavely, and Chief Messer are not liable as supervisors because: (1) there was no underlying constitutional violation; and (2) there is no evidence that they engaged in or acquiesced in any alleged use of excessive force. *Id.* at 15-16.

Hammock asserts – for the first time in his response brief – that the Officer defendants, Captain Snavely, and Chief Messer are not entitled to qualified immunity from his excessive-force claims because the record evidence shows that: (1) Officers Kingsborough, Garner, and Rogers unreasonably pulled him through the window of his car, slammed him to the ground, handcuffed him, and threw him in the back of a cruiser while unconscious; (2) Officer Williams unreasonably struck him in the face for not sitting with his feet on the floor; and (3) Officers Dittrich, Rhinehart, Soehnlen, and Stanz were present but failed to intervene. ECF Doc. 94-1 at 10-16.

### 1. Qualified Immunity Standard

Qualified immunity protects government officials from the burden of civil litigation and liability for actions performed within their discretionary functions, so long as their conduct did not violate the plaintiff's clearly established constitutional rights. *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (citing *Harrow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). In assessing whether qualified immunity applies, courts must consider whether: (1) the facts, construed in the light most favorable to the plaintiff, show that the defendant violated the plaintiff's constitutional rights; and (2) the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Grawey*, 567 F.3d at 309 (excessive-force claim); *Harrison*, 539 F.3d at 517 (deliberate-indifference claim). For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Binay v. Bettendorf*, 601 F.3d 640, 646-47 (6th Cir. 2010).

### 2. Excessive-Force

The *Fourth Amendment's* guarantee against unreasonable searches and seizures includes the right to be free from the use of excessive force during an arrest. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). In determining whether an officer used excessive force in violation of this right, the court must determine whether the officer: (1) used force; and (2) whether the force used was objectively unreasonable in light of "the facts and circumstances . . . viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Grawey*, 567 F.3d at 310. Important factors for this analysis include: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officer or others;

24

and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396; *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006); *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007)).  Courts must keep in mind that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion," and that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  Once an arrestee is subdued in such a way that he is not trying to flee and does not pose a threat to anyone, there is no need for force to be used. *Grawey*, 567 F.3d at 311.  Thus, to avail themselves of qualified immunity, Officers Kingsborough, Garner, Rogers, and Williams must show that Hammock has failed to produce evidence sufficient for a reasonable jury to conclude that they used an "objectively unreasonable" level of force during his arrest.  *Grawey*, 567 F.3d at 309-11; *Graham*, 490 U.S. at 394-97.

Hammock alleges excessive force in two distinct contexts: before he was restrained and after he was restrained.  First, Hammock alleges that the officers used excessive force when restraining him by pulling him through the window of his car, "slamming" him to the ground, and handcuffing him.  ECF Doc. 94-1 at 10-16; ECF Doc. 27 at 5.  Second, Hammock alleges that the officers used excessive force after he was restrained, when: (1) Officers Kingsborough, Rogers, and Garner beat him; and (2) Officer Williams struck him in the face while he was in the back of a cruiser.  ECF Doc. 94-1 at 10-16; *see also* ECF Doc. 27 at 5.

Hammock has not produced sufficient evidence to create a genuine issue of material fact that Officers Kingsborough, Garner, Rogers, and Williams used an "objectively unreasonable" level of force in restraining him.  Evaluating the facts and circumstances form the perspective of

25

a reasonable officer, the officers reasonably made the split-second decision to pull Hammock through his car window. *Graham*, 490 U.S. at 394, 396-97; *Grawey*, 567 F.3d at 310-11. Here, the undisputed record evidence shows that the officers reasonably believed they needed to quickly remove Hammock through the window of his car based on: (1) their later confirmed suspicions that Hammock had a gun; (2) Hammock's multiple attempts to flee and resist arrest; and (3) their belief that the door could not be opened after Hammock crashed into a tree. *Grawey*, 567 F.3d at 310; *Dunn v. Matatall*, 549 F.3d 348, 355 (6th Cir. 2008) (forcibly removing a suspect from his car was objectively reasonable given the "heightened suspicion and danger brought about by [a] car chase" and when officers did not know whether the suspect had a weapon); *see also Tallman v. Elizabethtown Police Dept.*, 167 F. App'x 459, 468 (6th Cir. 2006) (Clay, J., dissenting) (disagreeing with the majority's opinion that an officer did not use excessive force when he accidentally shot as he reached through his car window, because the officer admitted that he could have instead simply pulled the suspect through the car window); ECF Doc. 85-1 at 3; ECF Doc. 85-2 at 1-2; ECF Doc. 85-3 at 2; ECF Doc. 94-5 at 3-8; ECF Doc. 94-8 at 8, 20, 23, 33-34; ECF Doc. 94-9. Even accepting that the officers could have removed him through the car door instead, the fact that their decision to remove him through the window was nevertheless within the range of reasonable choices under the circumstances. *See Illinois v. Lafayette*, 462 U.S. 640, 647 (1983) (reasonableness of government activity does not hinge on the existence of a less-intrusive alternative). Further, while Hammock alleges that he suffered an injury when officers slammed him to the ground before handcuffing him, the undisputed record evidence does not indicate that the officers used an objectively unreasonable level of force in bringing him from the window of his car to the ground, so they could handcuff him. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the

peace of a judge's chambers, violates the *Fourth Amendment*.").  Thus, Hammock cannot show that the defendants violated his constitutional rights while restraining him, and the defendants are entitled to qualified immunity from those claims.  *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

In contrast, the officers are not entitled to qualified immunity from Hammock's claims that they beat him after he was restrained, and that Officer Williams struck him in the face while he was in the police cruiser.  Because Hammock's declaration complies with 28 U.S.C. § 1746's requirements and the defendants have not shown that it is inconsistent with prior deposition testimony, this Court must construe the factual statements – that the officers beat him after he was restrained, and that Officer Williams struck him in the face while he was restrained in the cruiser – in Hammock's favor.  ECF Doc. 94-2 at 1-2.  A reasonable jury could also determine that Hammock's tender ribs, loose tooth, swollen lip, and mild leg bruises were consistent with being beaten and struck in the face.  ECF Doc. 94-6 at 13; ECF Doc. 115-7 at 58.  No officer under any circumstances could believe that beating a restrained suspect or striking a restrained suspect in the back of cruiser is "objectively reasonable."  *See Phelps v. Coy*, 286 F.3d 295, 301-02 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat [the arrestee] after he had been neutralized, nor could a reasonable officer have thought there was."); *see also Baker v. City of Hamilton*, 471 F.3d 601, 607-08 (striking a suspect who surrendered, but was not yet in handcuffs, was unreasonable).  Further, the officers' alleged post-restraint conduct, accepted as true for the purposes of summary judgment, violated Hammock's clearly established rights.  *See Baker*, 471 F.3d at 607 (stating that the Sixth Circuit has held "repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law").  Thus, Officers Kingsborough, Rogers, Garner, and Williams are not entitled to

qualified immunity from Hammock's claims alleging that they used excessive force after he was restrained.  *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

Accordingly, if the Court looks past the defects in Hammock's second amended complaint, the defendants' motion for summary judgment should be: (1) granted in part with regard to Hammock's claims that Officers Kingsborough, Rogers, Garner, and Williams used excessive force while restraining him; and (2) denied in part with regard to Hammock's claims that Officers Kingsborough, Rogers, Garner, and Williams used excessive force after they restrained him.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Anderson*, 477 U.S. at 250-52; *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.  Nevertheless, because the allegations in Hammock's amended complaint are not sufficiently specific – and his attempt to cure the lack of specificity in his response brief is improper – I recommend that the Court grant the defendants' motion for summary judgment with regard to all of Hammock's excessive-force claims.[5]

### 3.  Failure-to-Intervene and Failure-to-Supervise Claims

To show that an officer violated a plaintiff's constitutional rights by failing to intervene against the excessive use of force, the plaintiff must show: (1) that the officer supervised the officers who used excessive force; or (2) owed the plaintiff a duty of protection.  *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  A supervising officer cannot be held liable merely because he played a passive role, had the right to control subordinate officers, or was simply aware of a subordinate officer's misconduct.  *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).  Instead, supervisory liability attaches only when the officer "encouraged or condoned the actions" of the subordinate officer.  *Id.*  A duty to protect an arrestee from excessive force arises when the officer:

---

[5] In making this recommendation, I incorporate my more extended discussion of the insufficiency of Hammock's complaint from pages 20-21, *supra*.

(1) observed or had reason to know that excessive force would be or was being used; and (2) had the opportunity and means to prevent the excessive use of force.  *Burgess*, 735 F.3d at 475.

Hammock has not produced sufficient evidence to establish a genuine issue of material fact regarding whether Officers Dittrich, Rhinehart, Soehnlen, and Stanz failed to intervene against the alleged excessive use of force.  *Burgess*, 735 F.3d at 475; *Bass*, 167 F.3d at 1048. Although undisputed record evidence establishes that Officers Stanz, Soehnlen, and Rhinehart were on duty during the incident, there is no evidence in the record establishing when or if they were present during Hammock's arrest.  *See* ECF Doc. 85-4 at 1; ECF Doc. 85-6 at 1; ECF Doc. 85-8 at 1; ECF Doc. 94-2 at 2.  The only evidence regarding where any of these officers were during Hammock's arrest indicates that Officer Rhinehart "supervised" the pursuit over the radio and did not receive a response to his questions until after Officers Rogers and Dittrich had secured Hammock.  ECF Doc. 85-4 at 1; ECF Doc. 94-10 at 2; ECF Doc. 94-11 at 1.  Further, the undisputed record evidence indicates that Officer Stanz, Soehnlen, and Rhinehart never observed any other officers use force on Hammock, and there is no evidence that Officer Rhinehart encouraged or condoned any of the alleged force.  *Burgess*, 735 F.3d at 475; *Bass*, 167 F.3d at 1048; ECF Doc. 85-4 at 2; ECF Doc. 85-6 at 1; ECF Doc. 85-8 at 1.  While Officer Dittrich was at the arrest scene, the undisputed evidence indicates that he was on the opposite side of the vehicle when Hammock was removed and restrained, and there is no evidence indicating that Officer Dittrich observed or was in a position to intervene against any other officer's use of force.  *Burgess*, 735 F.3d at 475; ECF Doc. 85-2 at 2; ECF Doc. 94-8 at 16; ECF Doc. 94-10 at 2.  Thus, Hammock cannot show that Officers Dittrich, Rhinehart, Soehnlen, and Stanz violated any of Hammock's clearly established constitutional rights by failing to intervene against the alleged use of force or that Officers Rhinehart and Soehnlen failed to supervise the

subordinate officers.  Therefore, Officers Dittrich, Rhinehart, Soehnlen, and Stanz are entitled to qualified immunity from Hammock's failure-to-intervene and supervisor-liability claims. *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

Captain Snavely and Chief Messer are also entitled to qualified immunity from Hammock's failure-to-intervene claims.  Here, Hammock has not produced any evidence that Captain Snavely or Chief Messer – as supervisors to the Officer defendants – encouraged or condoned any alleged use of excessive force.  *Burgess*, 735 F.3d at 475; *Bass*, 167 F.3d at 1048. Moreover, Hammock cannot show that Captain Snavely or Chief Messer played any more than a passive role in the alleged use of force, as the undisputed record evidence indicates only that Captain Snavely was involved in reviewing subordinate officers' reports after Hammock was delivered into the Richland County Jail's custody.  *Bass*, 167 F.3d at 1048; ECF Doc. 85-5; ECF Doc. 94-11.  Therefore, Hammock cannot show that Captain Snavely and Chief Messer violated his clearly established constitutional rights by failing to intervene against the alleged use of force or by failing to supervise their subordinate officers, and they are entitled to qualified immunity from those claims.  *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

If the Court looks past the defects in Hammock's second amended complaint, I recommend that the Court grant the Officers Dittrich, Rhinehart, Soehnlen, Stanz, Captain Snavely, and Chief Messer summary judgment on Hammock's failure-to-intervene and failure-to-supervise claims based on qualified immunity.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Anderson*, 477 U.S. at 250-52; *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

## IV.      Deliberate-Indifference-to-Serious-Medical-Needs Claims

In his complaint, Hammock claims that the Officer defendants and Captain Snavely were deliberately indifferent to his serious medical needs and intentionally denied or delayed his

30

access to medical care.  ECF Doc. 27 at 8.  He alleges that the officers should have known that

he needed medical care because he displayed "obvious and visible signs of head trauma."  Id.

Hammock also claims that Chief Messer, Captain Snavely, Officer Rhinehart, and Officer

Williams failed to supervise the subordinate officer and enforce established policy for "providing

medical care to an arrestee injured during apprehension."  Id. at 8.  Further, Hammock claims

that the Richland County defendants were deliberately indifferent to his serious medical needs

and intentionally denied or delayed access to medical care for his arrest injuries and preexisting

serious medical conditions while he was in jail.  ECF Doc. 27 at 9.

The Officer defendants, the Mansfield defendants, and the Richland County defendants

argue that the court should grant them summary judgment on Hammock's deliberate-indifference

claims because they are entitled to qualified immunity.  ECF Doc. 85 at 13-15; ECF Doc. 115 at

4-8.  The Officer defendants, Captain Snavely, and Chief Messer argue that Hammock cannot

show that they violated his constitutional rights by being deliberately indifferent to his serious

medical needs because: (1) he had only a minor cut to his lip and nose from striking his steering

wheel while attempting to flee from the police; and (2) he refused any medical treatment.  ECF

Doc. 85 at 13-15.  The Richland County defendants assert that Hammock cannot show that they

violated his constitutional rights by being deliberately indifferent to his serious medical needs

because: (1) medical records show that he was not denied medical care for his alleged injuries;

(2) he was given medical treatment each time he complained about medical issues; and (3) he has

not shown that his sleep apnea was a serious, life threatening, or caused obvious injuries due to

his lack of a CPAP machine.  Id. at 6-8.  Hammock responds that the Officer defendants and

Captain Snavely are not entitled to qualified immunity from his deliberate indifference claim

because: (1) the officers failed to summon medical assistance despite his obvious head trauma;

and (2) the officers acted outside of the scope of their duty by failing to follow departmental regulations requiring them to summon medical assistance.  ECF Doc. 94-1 at 18-21.

As discussed above, a government official is entitled to qualified immunity when: (1) the facts, construed in the light most favorable to the plaintiff, show that the official did not violate the plaintiff's constitutional rights; or (2) the asserted right was not "clearly established" at the time of the alleged misconduct.  *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

### A.      Deliberate Indifference Standard

The *Fourteenth Amendment* due process clause guarantees pretrial detainees the right to adequate medical treatment in the same manner that the *Eighth Amendment* provides the same right to prisoners.  *Burgess*, 735 F.3d at 476 (stating that pretrial detainee's claims are analyzed under the same rubric as prisoners' *Eighth Amendment* claims).  The Sixth Circuit has directed courts to apply "a two-prong test with objective and subjective components to assess" claims that government officials were deliberately indifferent to a pretrial detainee's serious medical needs. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  First, the court must determine whether the plaintiff had a "'sufficiently serious' medical need" under the objective prong. *Harrison*, 539 F.3d at 518.  A medical need is sufficiently serious if a diagnosing physician mandated treatment or a lay person would easily recognize the need for medical treatment. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004).  Superficial physical conditions, such as minor "cuts, bruising, and swelling" that are treated with ibuprofen are not "serious medical needs" requiring medical treatment.  *Burgess*, 735 F.3d at 477.  Second, the court must determine whether the government official had a "'sufficiently culpable state of mind'" in denying or delaying medical care under the subjective prong.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834).  Mere negligence is

insufficient.  *Burgess*, 735 F.3d at 476 (citing *Farmer*, 511 U.S. at 835).  At the very least, the

plaintiff must show that the defendant had "[k]nowledge of the asserted serious needs or of the

circumstances clearly indicating the existence of such needs."  *Blackmore*, 390 F.3d at 896

(internal quotation marks omitted).  When the plaintiff has received medical treatment, the court

will generally not second guess the provider's medical judgment unless the treatment provided

was so inadequate that it amounted to no treatment at all.  *Burgess*, 735 F.3d at 476 (citing

*Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

A supervisor cannot be held liable under 42 U.S.C. § 1983 based on the theory of

respondeat superior.  *Winkler v. Madison Cty.*, 893 F.3d 877, 898 (6th Cir. 2018).  Instead, the

plaintiff must show that the supervisor "'abandon[ed] the specific duties of his position . . . in the

face of actual knowledge of a breakdown in the proper workings of the department," and that

abandonment resulted in the plaintiff's injury.  *Id.*

## B.  The Officer Defendants

The Officer defendants are entitled to qualified immunity from Hammock's

deliberate-indifference claims.  Hammock has not produced any evidence indicating that he had

serious injuries that a lay person would recognize required medical treatment.  *Harrison*, 539

F.3d at 518; *Blackmore*, 390 F.3d at 897.  At most, the evidence in the record – including a

medical examination conducted hours after Hammock's arrest – establishes that Hammock had

minor cuts to his lip and nose, a swollen lip, and a loose tooth.  ECF Doc. 94-6 at 13-15, 76-78;

ECF Doc. 94-8 at 10, 26-27, 39; ECF Doc. 115-4 at 4-6; ECF Doc. 115-7 at 44-45, 58.

Hammock also cannot satisfy the subjective prong because there is no evidence that the officers

knew, or should have known, that he *required* medical treatment for his minor cuts, swelling,

and loose tooth.  *Brown*, 207 F.3d at 867; *Burgess*, 735 F.3d at 476; *Blackmore*, 390 F.3d at 896.

Even accepting as true that Hammock requested medical treatment, the undisputed record evidence indicates that he sought treatment only for his minor cuts, and there is no evidence indicating that he articulated a serious medical need beyond those cuts. ECF Doc. 94-2 at 2. Further, the Officers' failure to observe police department policy requiring officers to call for medical assistance when responding to any car crash is insufficient to show that they knew or should have known that Hammock had a serious medical need requiring medical treatment. *Cf. Davis v. Sherer*, 468 U.S. 183, 194 (1984) (stating that a defendant does not "lose [his] qualified immunity merely because [his] conduct violates some . . . administrative provision"). Moreover, Hammock received medical treatment on the same morning he was arrested, the nurse gave him only ibuprofen for his discomfort and swelling, and no evidence indicates that the delay in his treatment exacerbated his injuries. *See Burgess*, 735 F.3d at 476-77; *Blackmore*, 390 F.3d at 898 (explaining that a plaintiff must produce medical evidence to verify his complaint that "minor maladies" got worse due to a delay in medical care); ECF Doc. 94-6 at 13-15, 76-78; ECF Doc. 115-4 at 4-6; ECF Doc. 115-7 at 44-45, 58. Thus, Hammock cannot show that the Officer defendants violated his constitutional rights because he cannot show that: (1) the injuries he sustained during his arrest created a serious medical need; or (2) the officers knew or should have known that his injuries required medical treatment. *Burgess*, 735 F.3d at 476; *Harrison*, 539 F.3d at 518; *Brown*, 207 F.3d at 867. Accordingly, the Officer defendants are entitled to qualified immunity from Hammock's deliberate-indifference claims. *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

### C.     Captain Snavely and Chief Messer

Captain Snavely and Chief Messer are entitled to qualified immunity from Hammock's claim that they were deliberately indifferent to his serious medical needs. Here, Hammock has

not pointed to any record evidence indicating that Captain Snavely or Chief Messer were personally involved in his arrest, and the undisputed record evidence establishes that Captain Snavely was involved only in reviewing the subordinate officers' reports after Hammock was delivered to the Richland County Jail. *See* ECF Doc. 85-5; ECF Doc. 94-11. Further, Hammock cannot show that Captain Snavely or Chief Messer abandoned their supervisory role during a breakdown in the proper workings of the department because: (1) Hammock has not shown the individual officers were deliberately indifferent to his serious medical needs; and (2) no record evidence indicates that Captain Snavely or Chief Messer were on duty during Hammock's arrest or personally aware of the alleged events when they occurred. Thus, Hammock cannot show that Captain Snavely or Chief Messer were deliberately indifferent to his serious medical needs in violation of his constitutional rights, and Captain Snavely and Chief Messer are entitled to qualified immunity. *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

### D. The Richland County Defendants

The Richland County Defendants are entitled to summary judgment on Hammock's complaint that they were deliberately indifferent to his serious medical needs in violation of his *Fourteenth Amendment* rights. First, Hammock has not produced or pointed to, and independent review does not reveal, any evidence sufficient for a reasonable juror to determine that his alleged arrest injuries and knee problems were serious medical needs. Medical records indicate that the injuries Hammock sustained during his crash and arrest – a swollen lip, loose tooth, mild bruising and tenderness – were superficial, non-serious physical conditions that could be treated with ibuprofen and did not require medical treatment. *See Burgess*, 735 F.3d at 477; ECF Doc. 94-6 at 13-15, 18-19, 50-51, 54-56; ECF Doc. 115-7 at 17-18, 25-26, 32-34, 37, 44-45, 58. Further, the undisputed record evidence shows that, even though a physician wanted to schedule

35

a follow-up to determine if Hammock needed additional surgery, Hammock: (1) received his necessary surgery before his arrest; and (2) had a normal gait and "no major issues" continuing in his knee after surgery. *Blackmore*, 390 F.3d at 897; *Harrison*, 539 F.3d at 518; ECF Doc. 94-6 at 26-38, 44-49. In contrast, Hammock's sleep apnea was a serious medical need. Although evidence shows that Hammock did not require medical treatment as a result of his pre-arrest noncompliance with his CPAP treatment, the record evidence construed in Hammock's favor indicates that his sleep apnea was a serious medical need because: (1) a diagnosing physician determined that Hammock's sleep apnea required treatment; and (2) his untreated sleep apnea caused him to choke, stop breathing, and have increased blood pressure and cholesterol. *Blackmore*, 390 F.3d at 897; *Harrison*, 539 F.3d at 518; ECF Doc. 115-9 at 5-6; *see also* ECF Doc. 94-6 at 25, 32, 82.

Second, the Richland County defendants did not deliberately deny or delay care for Hammock's serious medical needs. *Brown*, 207 F.3d at 867. The undisputed record evidence shows that the Richland County defendants provided Hammock medical care each time he complained about any medical issue – including providing him treatment almost one hour after he was booked into the jail and arranging outside treatment for his dental infection. *Burgess*, 735 F.3d at 476; *Blackmore*, 390 F.3d at 896; ECF Doc. 94-6 at 13-15, 18-21, 50-51, 54-63, 66-68, 71-73, 75-78, 81-82; ECF Doc. 115-4 at 4-6; ECF Doc. 115-6 at 1-2; ECF Doc. 115-7 at 1-3, 13-14, 17, 20-25, 31-34, 37-39, 44-45, 58. The Richland County defendants also released Hammock to Ashland County for knee surgery once they received doctor's orders for a follow-up surgery, and his knee healed well notwithstanding the delay in treatment. *Burgess*, 735 F.3d at 476; *Blackmore*, 390 F.3d at 896; ECF Doc. 94-6 at 73, 81; ECF Doc. 115-8 at 1, 3; ECF Doc. 115-9 at 2-3. Further, Hammock cannot show that the Richland County defendants

deliberately denied him access to his CPAP machine, because the undisputed record evidence indicates that: (1) Hammock did not inform the Richland County defendants that he needed a CPAP at booking; and (2) the Richland County defendants did not know he was prescribed a CPAP until they received records detailing his noncompliance with his CPAP prescription on November 10, 2015.  *Burgess*, 735 F.3d at 476; *Blackmore*, 390 F.3d at 896; ECF Doc. 94-6 at 25, 32, 76-78; ECF Doc. 115-4 at 4-6.  Moreover, the undisputed record evidence indicates that the Richland County defendants would have allowed Hammock to use his CPAP if he had it dropped off at the jail, but Hammock did not do so.  ECF Doc. 115-3 at 1.  Thus, even if this Court considered all of Hammock's alleged medical conditions as "serious medical needs," Hammock has not produced or pointed to sufficient evidence to create a genuine issue of material fact regarding whether they were deliberately indifferent to his medical needs.  *Celotex Corp*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250-52; *Burgess*, 735 F.3d at 476; *Harrison*, 539 F.3d at 518; *Brown*, 207 F.3d at 867.  Accordingly, the Richland County defendants are entitled to summary judgment on Hammock's deliberate indifference claims.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Anderson*, 477 U.S. at 250-52.

I recommend that the Court grant the Officer defendants', Mansfield defendants', and Richland County defendants' motions for summary judgment on Hammock's deliberate-indifference claims.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Anderson*, 477 U.S. at 250-52; *Grawey*, 567 F.3d at 309; *Harrison*, 539 F.3d at 517.

## V.  *Monell* Claims

In his complaint, Hammock alleges that Mansfield City and Chief Messer in his official capacity as a policy-maker were deliberately indifferent to their employees' alleged constitutional violations because they: (1) failed to train the officers to differentiate between

head trauma and alcohol/drug use; and (2) failed to adopt a policy requiring officers to use dash or body cameras.  ECF Doc. 27 at 9, 11.  Hammock also alleges that the Richland County defendants were deliberately indifferent to their employees' alleged constitutional violations because they failed to train their employees to recognize head trauma and summon medical care. *Id.* at 10.  Further, Hammock alleges that Sheriff Sheldon, in his official capacity, had a policy or custom of denying or delaying medical care, which required Hammock's tooth to be extracted when it could have been fixed.  *Id.* at 11.  Hammock's failure-to-train and failure-to-supervise claims against Mansfield City, Chief Messer in his official capacity, Richland County, Sheriff Sheldon in his official capacity, and Sergeant Collier in his official capacity are all claims against the City of Mansfield and Richland County as government entities (or "*Monell* claims").  *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 & n.55 (1978) (explaining that official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent"); *Cf. Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (explaining that a failure-to-train claim against a district attorney, in his capacity as a government policy-maker, was an official-capacity action against the municipality).

The Mansfield defendants and Richland County defendants argue that they are entitled to summary judgment on Hammock's *Monell* claims.  ECF Doc. 85 at 15-19; ECF Doc. 115 at 9-13.  They assert that, because Hammock has not produced evidence that could support an underlying constitutional violation, Hammock's *Monell* claims must fail.  ECF Doc. 85 at 15-19; ECF Doc. 115 at 9-13.  The Mansfield defendants assert that Hammock has not produced any evidence that: (1) they had a "custom or practice" of depriving individuals of their constitutional rights; (2) Mansfield City's use-of-force policies were inadequate; (3) Mansfield City was deliberately indifferent regarding its officers' use-of-force and use of dash or body cameras;

(4) Mansfield City was on notice that officer training was deficient or likely to cause injury; or

(5) Mansfield City had a policy of providing officers with inadequate equipment.  ECF Doc. 85 at 17-19.  The Richland County defendants also contend that Hammock has not produced any evidence that: (1) Richland County failed to train or supervise its jail employees; or (2) Richland County had a custom or policy of denying or delaying medical care.  ECF Doc. 115 at 10-13.  Further, the Richland County defendants argue that the undisputed record evidence shows that jail employees receive training on jail policies and procedures, and that Hammock received adequate care for his knee and dental problems.  *Id.* at 12-13.  Hammock responds that his failure-to-train and failure-to-supervise claims against the Mansfield defendants should not be dismissed because there was an underlying constitutional violation and the record contains evidence of an inadequate custom or policy.  ECF Doc. 94-1 at 21-27.

### A.    *Monell* Claim Standards

Although a local government or municipality may not be held vicariously liable for unconstitutional acts by its employees, it may be liable if its own action "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such a deprivation.  *See Monell*, 436 U.S. at 692.  "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused" them to suffer a constitutional violation.  *Connick*, 563 U.S. at 60 (quoting *Monell*, 436 U.S. at 691, 694); *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").  To satisfy this requirement, the plaintiff "must identify the policy, connect the policy to the [municipality] itself, and show that the particular injury was incurred because of the execution of that policy."  *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993).  Official policy includes lawmakers' decisions, policy-makers'

acts, and "practices so persistent and widespread as to practically have the force of law."

*Connick*, 563 U.S. at 61. In *Board of County Commissioners v. Brown*, the Supreme Court explained that:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. * * * Whe[n] a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees.

520 U.S. 397, 404-05 (1997) (emphasis in original) (citations omitted). Such a plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407. "[S]imple or even heightened negligence will not suffice." *Id.*

In light of the *Monell* standard, a local government can be held liable under a "failure-to-train" theory only when: (1) the local government was aware, or on notice, that its training program was inadequate; (2) the local government or policy-makers chose not to change the training program despite the known or obvious consequences for citizens' constitutional rights; and (3) the government employees' training deficiencies actually caused the alleged constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 389-92 (1989) ("[L]esser standards of fault and causation would open municipalities to unprecedented liability under § 1983."); *Connick*, 563 U.S. at 51-52. This standard "typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005); *see also Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular

respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").  The same standard applies to *Monell* claims asserting a "failure-to-supervise" theory.  *See Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010) (noting that a "failure to supervise" theory of municipal liability is related to the inadequate training theory and "must meet the rigorous standards of culpability and causation" that the Supreme Court set out for such claims); *cf. Brent v. Wayne Cty. Dept. of Human Serv.*, 901 F.3d 656, 698 (6th Cir. 2018) (analyzing failure-to-train and failure-to-supervise claims under the same rubric).

### B.  Mansfield Defendants

The Mansfield defendants are entitled to summary judgment on Hammock's failure-to-train and failure-to-supervise *Monell* claims.  As discussed above, Hammock has not produced evidence that a jury could rely upon to find that the Mansfield defendants, or the subordinate officers, violated his constitutional rights by: (1) using excessive force before he was restrained; or (2) denying or delaying medical treatment with deliberate indifference to his serious medical needs. Thus, Hammock cannot show that the Mansfield defendants are liable under *Monell* for pre-restraint excessive force or deliberate indifference to his medical needs, and his *Monell* claim may only prevail – if at all – on his claims that officers used excessive force after he was restrained.  *Connick*, 563 U.S. at 60; *Monell*, 436 U.S. at 694; *Robertson*, 753 F.3d at 622. Nevertheless, Hammock has not produced any evidence that the Mansfield defendants: (1) were aware of a training or supervision deficiency that resulted in excessive force or deliberate indifference to serious medical needs and did not take corrective action; or (2) had a policy or custom of permitting excessive use of force or deliberate indifference to serious medical needs. *Connick*, 563 U.S. at 51-52, 60, 62; *Monell*, 436 U.S. at 694; *Garner*, 8 F.3d at 364; *Brown*, 520

41

U.S. at 404-07; *Harris*, 489 U.S. at 389-92; *Miller*, 408 F.3d at 815.  Here, the undisputed record evidence shows that the Mansfield defendants' regulations precluded officers from using excessive force and required officers to call medical assistance when they used force in response to resistance or responded to car crashes with injuries.  ECF Doc. 94-12 at 1, 8; ECF Doc. 94-14 at 4, 6.  Further, the undisputed record evidence shows that the Mansfield defendants ensured that their training program was appropriate by conducting annual use-of-force reviews and implementing recommended training changes.  ECF Doc. 94-15.  Moreover, on rare occasions that citizens complained about excessive use of force, the Mansfield defendants conducted extensive investigations and disciplined officers in the two cases in which officer misconduct allegations were confirmed.  ECF Doc. 94-13 at 1-29; ECF Doc. 94-14 at 2-14; ECF Doc. 94-15 at 9, 20, 32-33.  Thus, Hammock cannot show that the Mansfield defendants were deliberately indifferent to the likelihood that deficiencies in the officers' training or supervision would result in a violation of his or other citizens' constitutional rights, and the Mansfield defendants are entitled to judgment as a matter of law.  Fed. R. civ. P. 56(a); *Maben*, 887 F.3d at 258; *Anderson*, 477 U.S. at 250-52.

### C.    Richland County Defendants

The Richland County Defendants are entitled to summary judgment on Hammock's failure-to-train and failure-to-supervise *Monell* claims.  As discussed above, Hammock has not produced, and independent review does not reveal, evidence that a jury could rely upon to find that the Richland County defendants, or their subordinates, violated his constitutional rights by denying or delaying treatment with deliberate indifference to his serious medical needs.  Thus, because there is no underlying constitutional violation, Hammock cannot show that the Richland County defendants are liable under *Monell*.  *Connick*, 563 U.S. at 60; *Monell*, 436 U.S. at 694;

42

*Robertson*, 753 F.3d at 622.  Even if the court were to assume there was an underlying constitutional violation, Hammock has not produced any evidence that the Richland County defendants: (1) were aware of any deficiencies in their employees' training or performance that resulted in unconstitutional behavior; or (2) had a policy or custom of denying or delaying medical care.  *Connick*, 563 U.S. at 51-52, 60, 62; *Monell*, 436 U.S. at 694; *Garner*, 8 F.3d at 364; *Brown*, 520 U.S. at 404-07; *Harris*, 489 U.S. at 389-92; *Miller*, 408 F.3d at 815.  Here, the undisputed record evidence indicates that the Richland County defendants provided adequate medical care for all of Hammock's medical needs – serious or otherwise – each time Hammock complained of symptoms or asked for treatment.  ECF Doc. 94-6 at 13-15, 18-21, 25-38, 44-51, 54-63, 66-68, 71-73, 75-78, 81-82; ECF Doc. 115-4 at 4-6; ECF Doc. 115-6 at 1-2; ECF Doc. 115-7 at 1-3, 13-14, 17, 20-25, 31-34, 37-39, 44-45, 58; ECF Doc. 115-8 at 1, 3; ECF Doc. 115-9 at 2-3.  Further, Hammock has not produced any evidence that the Richland County defendants were aware of prior occasions on which jail staff were deliberately indifferent to inmates' medical needs and the Richland County defendants did not take corrective action.  *Miller*, 408 F.3d at 815; *Connick*, 563 U.S. at 62.  Thus, Hammock cannot show that the Richland County defendants were deliberately indifferent to the likelihood that deficiencies in jail staff's training or supervision would result in a violation of his or other citizens' constitutional rights, and the Richland County defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Anderson*, 477 U.S. at 250-52.

I recommend that the Court grant the Mansfield defendants and Richland County defendants summary judgment on Hammock's *Monell* claims.

## VI.    Emotional Distress Claims

In the last paragraph of his complaint, Hammock alleges that the Officer defendants, Mansfield defendants, and Richland County defendants "knew or should [have] known that their negligent and deliberate indifference to [Hammock's] serious medical needs . . . would result in serious emotional distress to [Hammock]." ECF Doc. 27 at 12.  He claims that the defendants' conduct was "so extreme and outrageous" that it exceeded "all possible bounds of decency," and that "no reasonable person could be expected to endure" the resulting "mental anguish." *Id.*  He alleges that, as a result of his emotional distress, he was prescribed "several medications during his detention." *Id.*

The Richland County defendants argue that they are entitled to summary judgment on Hammock's state law emotional-distress claims. ECF Doc. 115 at 14-16.  The Richland County defendants assert that Hammock has not asserted any facts, or produced any evidence, showing that they intended their acts/omissions, or should have known their acts/omissions, would cause Hammock to suffer emotional distress. *Id.* at 15.  Further, the Richland County defendants assert that Hammock's emotional-distress claims must fail because Richland County and its employees are entitled to statutory immunity. *Id.* at 15-16.

### A.    Emotional Distress Standard

The Sixth Circuit has distinguished between prayers for damages due to "severe emotional distress" sustained as a result of a constitutional violation actionable under 42 U.S.C. § 1983, and independent emotional-distress claims, which are not actionable under 42 U.S.C. § 1983. *See, e.g.*, *Chatman v. Slagle*, 107 F.3d 380, 384 (6th Cir. 1997) (noting that, whereas an independent emotional-distress claim requires the plaintiff to show outrageous or extreme conduct by the defendant, there is no such requirement in a prayer for emotional damages based

44

on a constitutional violation); *see also Voyticky v. Vill. Of Timberlake*, 412 F.3d 669, 678 (6th Cir. 2005) ("We have not, however, held that intentional infliction of emotional distress, by itself, amounts to a cognizable constitutional claim remediable pursuant to 42 U.S.C. § 1983."). Thus, when federal courts are confronted with an independent emotional-distress claim, they must apply state law.  *Cf. Voyticky*, 412 F.3d at 678 (applying Ohio law in evaluating an intentional infliction of emotional-distress claim in a § 1983 case).

To show that a defendant intentionally or negligently inflicted emotional distress, "'a plaintiff must prove (1) that the defendant intended to cause [or should have known that his actions would cause] the plaintiff to suffer serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of the plaintiff's serious emotional distress.'"  *See Burgess*, 735 F.3d at 480 (citing *Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994)).  Conduct is "extreme and outrageous" when it "go[es] beyond all possible bounds of decency, and [would] be regarded as atrocious, and utterly intolerable in a civilized community."  *See Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051, 1054 (Ohio 2007).

### B.    Ohio Statutory Immunity

Ohio provides statutory immunity from liability to political subdivisions, including municipalities and counties, and employees of political subdivisions.  *See* Ohio Rev. Code §§ 2744.02, Ohio Rev. Code §§ 2744.03.  Under Section 2744.02(A)(1), political subdivisions are not liable for damages in tort actions for any injuries or losses caused by any act or omission of the political subdivision or its employees.  Ohio Rev. Code § 2744.02(A)(1).  Although this immunity is subject to some exceptions, there are no exceptions to immunity that apply to tort

claims resulting from the governmental functions of a political subdivision or its employees.  *See* Ohio Rev. Code § 2744.02(B) (providing for exceptions when injuries or losses are caused by negligent operation of motor vehicles, negligent performance of proprietary functions, negligent failure to maintain roads, negligent failure to maintain government buildings, and when civil liability is expressly imposed by statute).  "The employees of political subdivisions are immune from liability pursuant to R.C. 2744.03(A)(6) unless the employee's acts or omissions 'were with malicious purpose, in bad faith, or in a wanton or reckless manner.'"  *Cook v. Cincinnati*, 658 N.E.2d 814, 820 (Ohio App. Ct. 1995) (quoting Ohio Rev. Code § 2744.03(A)(6)); *see also id.* at 820-21 ("[A] police officer, for example, cannot be held personally liable for acts committed while carrying out his or her official duties unless one of the exceptions to immunity is established").  Ohio courts have construed these exceptions as follows:

> "'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified.  * * *  'Bad faith' involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another.  * * * [W]anton misconduct is the failure to exercise any care whatsoever.  * * *  [M]ere negligence is not converted into wanton conduct unless the evidence establishes a disposition to the perversity on the party of the tortfeasor.  Such perversity must be under such conditions that the actor must be conscious that his conduct will, in all likelihood, result in an injury.'"  * * *  '[R]eckless' conduct refers to an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of * * * harm[, and] that this risk is greater than that necessary to make the conduct negligent.

*Thornton v. Summit County Children Serv. Bd.*, No. 23490, 2007-Ohio-4657 ¶¶11-12 (Ohio App. Ct. 2007) (citations omitted).  Statutory immunity is an affirmative defense, and it is waived if not raised.  *See Supportive Solutions, LLC v. Elec. Classroom of Tomorrow*, 997 N.E.2d 490, 495 (Ohio 2013).

## C.     Richland County Defendants

The Richland County defendants are entitled to summary judgment on Hammock's emotional-distress claims. Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Celotex Corp*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250-55.  To the extent Hammock's emotional distress argument is a prayer for emotional damages based on his deliberate-indifference-to-serious-medical-needs claims, it fails because the Richland County defendants are entitled to summary judgment on Hammock's deliberate-indifference claims, as discussed above.  *See Chatman*, 107 F.3d at 384; *Voyticky*, 412 F.3d at 678.  To the extent that it is a separate state-law claim, the Richland County defendants are statutorily immune because: (1) Hammock's claim against Richland County does not fall within any of the exceptions in Ohio Rev. Code § 2744.02; and (2) Hammock has not produced any evidence indicating that Sheriff Sheldon or Officer Collier acted with malicious purpose, in bad faith, or in a wanton or reckless manner with regard to his medical care.  Ohio Rev. Code §§ 2744.02, Ohio Rev. Code §§ 2744.03; *Cook*, 658 N.E.2d at 820-21; *Thornton*, 2007-Ohio-4657 ¶¶11-12.  Further, as discussed in detail above, Hammock has not produced any evidence indicating that the Richland County defendants denied or delayed him medical treatment at all, because they provided him adequate medical care each time he complained of symptoms.  ECF Doc. 94-6 at 13-15, 18-21, 25-38, 44-51, 54-63, 66-68, 71-73, 75-78, 81-82; ECF Doc. 115-4 at 4-6; ECF Doc. 115-6 at 1-2; ECF Doc. 115-7 at 1-3, 13-14, 17, 20-25, 31-34, 37-39, 44-45, 58; ECF Doc. 115-8 at 1, 3; ECF Doc. 115-9 at 2-3.  Moreover, Hammock's argument that the defendants' conduct required him to take antidepressant medication is unavailing because the undisputed record evidence indicates that his depression and treatment predated his admission to the Richland County Jail.  ECF Doc. 94-6 at 13; ECF Doc. 115-7 at 3.  Thus, Hammock cannot show that there is a genuine issue of material fact that the Richland County defendants committed any extreme or outrageous conduct, much less that

they intended such conduct to cause serious emotional distress. *Burgess*, 735 F.3d at 480;

*Phung*, 644 N.E.2d at 289; *Yeager*, 453 N.E.2d at 671; *Welling*, 866 N.E.2d at 1054.

Accordingly, I recommend that the Court grant the Richland County defendants summary

judgment on Hammock's emotional-distress claims. Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at

258; *Celotex Corp*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250-55.

### D.      Officer defendants and Mansfield defendants

The Officer defendants and Mansfield defendants do not specifically address Hammock's

emotional-distress claims in their motion for summary judgment. *See generally* ECF Doc. 85.

Nevertheless, the Court *sua sponte* may consider whether summary judgment in favor of the

Officer defendants and Mansfield defendants is appropriate, because Hammock was on notice

that he needed to come forward with all of his evidence supporting his claims. *See Delphi Auto.*

*Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 379 (6th Cir. 2011) ("Although not favored

by this court, district courts are permitted to grant summary judgment *sua sponte* . . . ['] so long

as the [opposing] party was on notice that [he] had to come forward with all of [his] evidence.'"

(citations omitted)); *see also id.* at 380 ("[T]his court has examined whether the grounds upon

which the district court granted summary judgment . . . were at least addressed by the party

implicitly in the facts and arguments presented in the motion.").  Moreover, this Report and

Recommendation – which outlines the summary judgment standard, the requirement that

Hammock point to evidence supporting his claims in order to survive summary judgment, the

requirements for an emotional distress claim, and an opportunity for objection – is sufficient to

satisfy the requirement that the Court give Hammock notice that the court is considering

summary judgment and a reasonable opportunity to respond. *Id.* at 379 (stating that the opposing

party "must be afforded notice and a reasonable opportunity to respond to all the issues to be

considered by the court"); *Johnson v. Bently*, No. 90-5019, 1991 U.S. App. LEXIS 23259 *7 (6th Cir. 1991) (holding that a magistrate judge's R&R provided notice and the opportunity to respond to the court's sua sponte grant of summary judgment); *accord Ford v. Elsbury*, 32 F.3d 931, 938 (5th Cir. 1994); *Harris v. Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011); *Lindsey v. U.S. Bureau of Prisons, U.S. Dept. of Justice*, 736 F.2d 1462, 1463 (11th Cir. 1984), *vacated on other grounds*, 469 U.S. 1082 (1984); *but see Lucas v. Dept. of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995) (a magistrate judge's R&R was not sufficient notice when it did not explicitly advise a *pro se* litigant that he needed to point to evidence supporting his claims or risk summary judgment).

The Officer defendants and Mansfield defendants are also entitled to summary judgment on Hammock's emotional-distress claims.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Celotex Corp*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250-55.  Like his claim against the Richland County defendants, to the extent Hammock's emotional-distress argument is a prayer for damages based on his deliberate-indifference claims, it fails because the Officer defendants and Mansfield defendants are entitled to summary judgment on Hammock's deliberate-indifference claims, as discussed above.  *See Chatman*, 107 F.3d at 384; *Voyticky*, 412 F.3d at 678.  Further, because Hammock has not produced any evidence that the Officer defendants or Mansfield defendants were deliberately indifferent to his serious medical needs, he has not produced evidence sufficient to create a genuine issue of material fact that they caused, or intended to cause, him to suffer serious emotional distress as a result of their deliberate indifference to his serious medical needs.  Although Hammock might have been able to assert an emotional-distress claim based on his argument that the Officer defendants beat and struck him after he was restrained, Hammock's complaint claims only that he suffered emotional distress as a result of the defendants' alleged deliberate indifference to his serious medical needs.  Thus,

49

Hammock cannot show that there is a genuine issue of material fact that the Officer defendants and Mansfield defendants committed any extreme or outrageous conduct with regard to his medical needs, much less that they intended such conduct to cause serious emotional distress. *Burgess*, 735 F.3d at 480; *Phung*, 644 N.E.2d at 289; *Yeager*, 453 N.E.2d at 671; *Welling*, 866 N.E.2d at 1054.

Accordingly, I recommend that the Court exercise its discretion to grant the Officer defendants and Mansfield defendants summary judgment on Hammock's emotional distress claims.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Celotex Corp*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250-55; *Delphi Auto. Sys., LLC*, 418 F. App'x at 379.

## VII.    Leave to Amend

Hammock's requests leave to amend his complaint because he "recently discovered deficiencies."  ECF Doc. 133.  He states that he "requests leave in light of the course of discovery of the identity of each defendant's participation and/or lack of participation, which has been made known to Plaintiff."  ECF Doc. 133.  The defendants respond that Hammock's motion should be denied because: (1) Hammock filed his motion to amend well past the deadlines for amending the pleadings and completing discovery; (2) he has not shown good cause, as required under Fed. R. Civ. P. 16(b)(4); (3) amendment at this stage – well after the defendants filed motions for summary judgment – would unfairly prejudice them; and (4) Hammock's proposed amendments would be futile and cause undue delay.  ECF Doc. 134; ECF Doc. 138.

A party may amend his pleading once as a matter of course within 21 days after he filed it, or within 21 days after any required responsive pleading was filed.  Fed. R. Civ. P. 15(a)(1). In all other cases, the party must first obtain the opposing party's consent or leave of court.

R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, when the deadline for amending pleadings set in the court's scheduling order has passed, the party seeking amendment "first must show good cause under [Fed. R. Civ. P. 16(b)] for failure to earlier seek leave to amend" and the district court must consider whether granting leave to amend would unfairly prejudice the opposing party.  *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).  "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements."  *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quotation omitted).  Although "delay alone . . . is not enough to bar" amendment, amendment after the close of discovery and after motions for summary judgment were served may "create significant prejudice" to the opposing parties.  *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (affirming denial of leave to amend because plaintiff was aware of the basis for his claim for months before seeking amendment, the time for discovery had passed, the dispositive motions deadline had passed, and a motion for summary judgment was filed); *Leary*, 349 F.3d at 909 (holding that a district court did not abuse its discretion when it determined that plaintiffs failed to show good cause to amend their complaint after the dispositive motion deadline).

Hammock has not shown good cause for failing to earlier seek leave to amend his complaint.  Fed. R. Civ. P. 16(b); *Leary*, 349 F.3d at 909.  Here, Hammock's statement that he seeks leave to amend "in light of the course of discovery of the identity of each defendant's participation" is insufficient to explain why he did not earlier seek leave to make the amendments to his complaint that he now seeks to make.[6]  Fed. R. Civ. P. 16(b); *Leary*, 349 F.3d

---

[6] It should also be noted that Hammock already had an opportunity to file an amended complaint, and that I explained in my previously issued R&R that Hammock would have to show "good cause" if he wished to amend his complaint.  *See* ECF Doc. 27 (amended complaint); ECF Doc. 118 at 21 n.4 (R&R).

at 909; *see generally* ECF Doc. 133. Discovery closed on March 4, 2019 – over six months

before Hammock filed his motion to amend. ECF Doc. 96; ECF Doc. 133. Any information

about the parties' specific conduct that was uncovered in "the course of discovery" would have

been known to Hammock by the close of discovery. ECF Doc. 133. Further, granting leave to

amend at this late stage would significantly prejudice the defendants because the deadline for

filing dispositive motions passed in April 2019 and all the defendants have filed motions for

summary judgment. *Duggins*, 195 F.3d at 834; *Leary*, 349 F.3d at 909; ECF Doc. 85; ECF Doc.

115. Accordingly, I recommend that Hammock's motion for leave to amend (ECF Doc. 133) be

denied.

## VIII.   Summary and Recommendation

Based upon a review of the Rule 56 evidence and after applying the applicable legal

standards, I find that Hammock has failed to sufficiently plead excessive-force claims against the

individual officer defendants.[7]   Hammock also has not produced sufficient evidence to create a

genuine issue of material fact that: (1) the individual Officer defendants are not entitled to

qualified immunity on his claims that they used excessive force before he was restrained, failed

to intervene against an alleged excessive use of force in violation of his constitutional rights, and

were deliberately indifferent to his serious medical needs; (2) the Officer defendants, Mansfield

defendants, and Richland County defendants were deliberately indifferent to his serious medical

needs; (3) the Mansfield defendants and Richland County defendants failed to train and

supervise their employees with deliberate indifference to his constitutional rights; and (4) the

Officer defendants, Mansfield defendants, and Richland County defendants engaged in extreme

---

[7] As discussed above, Hammock's attempt to cure the deficiencies in his response to the defendants' motion for summary judgment fails because a response to a motion for summary judgment is not the proper avenue for curing deficiencies in a complaint. *See* pages 20-21, *supra*. Further, Hammock has not sought leave to file a second amended complaint.

and outrageous conduct that they intended to cause, or should have known would cause, him to suffer serious emotional distress.  Thus, the Officer defendants, Mansfield defendants, and Richland County defendants are entitled to judgment as a matter of law on all of Hammock's claims.

Based upon these findings, I recommend that the Officer defendants', Mansfield defendants', and Richland County defendants' motions for summary judgment (ECF Doc. 85; ECF Doc. 115) be GRANTED.  Further, I recommend that summary judgment on Hammock's emotional-distress claims be GRANTED *sua sponte* in favor of the Officer defendants and Mansfield defendants.  Because Hammock has no remaining claims in this case, I recommend that Hammock's motion for judicial notice (ECF Doc. 100) be DENIED AS MOOT.  Finally, I recommend that Hammock's motion for leave to amend his complaint (ECF Doc. 133) be DENIED.

Dated: November 13, 2019

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).